UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
FREDERICK DIAZ,

                    Petitioner,

- against -

JOSEPH L. BELLNIER,

                    Respondent.
----------------------------------------------------------x

**MEMORANDUM & ORDER**
08 CV 4009 (MKB)

MARGO K. BRODIE, United States District Judge:

       Petitioner Frederick Diaz brings the above-captioned *pro se* petition pursuant to 28 U.S.C. § 2254, in which he alleges that he is being held in state custody in violation of his federal constitutional rights. Petitioner's claims arise from a judgment of conviction after a jury trial in New York Supreme Court, Kings County, for four counts of murder (two counts of murder in the second degree and two counts of felony murder). Petitioner was sentenced to 50 years to life imprisonment. Petitioner appealed his conviction to the New York Appellate Division, Second Department, claiming that: (1) he was denied due process when the trial court failed to instruct the jury not to consider his co-defendant's confession as evidence of Petitioner's guilt; (2) the prosecutor's summation was prejudicial; (3) the trial court's instructions regarding the burglary charge were erroneous; and (4) the consecutive sentences were excessive and harsh. The Appellate Division rejected Petitioner's claims and affirmed his conviction. *People v. Diaz*, 544 N.Y.S.2d 500 (App. Div. 1989). On October 26, 1989, the New York Court of Appeals denied leave to appeal. *People v. Diaz*, 74 N.Y.2d 895 (1989). In the instant petition, Petitioner asserts (1) ineffective assistance of trial counsel; (2) prosecutorial misconduct; (3) newly discovered evidence through DNA tests; and (4) actual innocence. For the reasons set forth below, the petition is denied.

I.  **Background**

The evidence at trial established that on October 12, 1984, the victims – Zina Kogan and her twelve-year-old son, Edward Kogan – were stabbed to death with two types of knives and that Zina Kogan was also strangled. (Resp. Aff. Ex. B1 (Trial Transcript ("Tr.") 133–37).) On the evening of the murders, Abraham Schwartman, Zina Kogan's father, had been in his daughter's apartment visiting with her and left the apartment at approximately 6 p.m. (Tr. 20.) Shortly after Mr. Schwartzman left his daughter's apartment, neighbors below Zina Kogan's apartment heard excessive noise and called Mr. Schwartzman, who returned within 10 minutes to his daughter's apartment. (*Id.*) Because the door was locked, he entered his daughter's apartment from the window of a vacant apartment next door. (*Id.*) Mr. Schwartzman found Zina Kogan lying on the floor. (*Id.*) At around 6:15 p.m., Officer Cavallaro was called to the apartment and found Zina Kogan's body face down and Edward Kogan's body in his room. (Tr. 23–24.)

Nearly a year later, on separate dates in early October 1985, Petitioner and his co-defendant, David Diaz ("David") (no relation to Petitioner), both eighteen-years-old, were questioned by Detectives Powell and Flaherty after police were contacted with information implicating Petitioner and David in the Kogan murders. (Tr. 155–56, 172–75, 191–92, 205.) Both Petitioner and David were advised of their *Miranda* rights and initially denied any involvement in the murders. (Tr. 39–40, 86–88, 100–01.)

Following a polygraph test and several hours of questioning, Petitioner agreed to make a statement. (Tr. 103.) After notifying Petitioner of his *Miranda* rights, Assistant District Attorney Pasquale D'Orsi questioned Petitioner about the murders on videotape. (*See* Tr. 140–

2

45; Resp. Aff. Ex. F (Videotaped Statement Transcript ("Video Tr.")); Resp. Aff. Exs. D & E (videotaped statements transferred to digital video discs).)[1]

Petitioner stated that he and David planned to rob the Kogan apartment and that he was armed with a pocket knife and that David had a dagger. (Video Tr. 1–4; Tr. 142–43.) Petitioner and David had both worked for the husband and father of the murder victims, Alex Kogan, and knew where the Kogans lived and that they kept money in their home. (Video Tr. 4; Tr. 38, 44, 174, 189.) Petitioner stated that they knocked on the door and that David told Zina Kogan that they were sent by her husband to do some repairs. (Video Tr. 6.) Zina Kogan let them in and tried to contact her husband but could not reach him. (*Id.*) Petitioner stated that he was surprised when David then went behind Zina Kogan and stabbed her repeatedly. (*Id.* at 8.) Petitioner then stated that David went to the boy's room and stabbed him too. (*Id.* at 9.)

Petitioner further stated that David did all the stabbing of the victims and only admitted to choking Zina Kogan with a telephone cord because she was making noises and he was afraid that she would identify them to the neighbors knocking on the door. (Video Tr. 10.)[2]

Petitioner stated that David found a gun but that they did not have time to take anything else since neighbors had started knocking on the door. (*Id.* at 9.) Petitioner and David left

---

[1] Prior to Petitioner's trial, the court held a suppression hearing pursuant to *People v. Huntley*, 15 N.Y.2d 72, 78 (1965) to determine the voluntariness of Petitioner's statement. (Resp. Aff. Ex. A1 (*Huntley* Tr. 1-62).) Petitioner argued that his confession should be suppressed because it was given under duress based on the length of time he was in police custody and the nature of the interrogations. (*Huntley* Tr. 66.) The trial court denied Petitioner's motion to suppress. (*Huntley* Tr. 62.)

[2] Alternatively, David stated that Petitioner also participated in the stabbing of the victims. (*See* Video Tr. 4.) At trial, David testified that Detectives Powell and Flaherty threatened to arrest his family and he made the statement to prevent their arrest. (Tr. 160–61.) David also testified that he was fed information by the detectives and made up parts of the statement. (Tr. 165–169.)

through the window and ran down the fire escape. (*Id.* at 10.) Once home, Petitioner took off his clothes and threw them in the garbage along with the knife. (*Id.* at 11.) Petitioner stated that David took the gun to his grandmother's home where it was later discarded by David's stepfather. (*Id.*) The videotaped statements of Petitioner and his co-defendant were played for the jury. (Tr. 143, 149.)

At trial, Petitioner took the stand and testified that he was taken into custody at 10 a.m. on October 4, 1984, and that he denied any involvement in the Kogan murders for four hours. (Tr. 175–76, 178.) Petitioner further testified that the detectives berated him, yelled at him and threatened to hit him if he did not talk. (Tr. 177–78, 183.) Similar to David, Petitioner testified that the detectives fed him information about the crime (Tr. 178–79, 184–187) and that neither the statement he gave to police nor the videotaped statement to the Assistant District Attorney was true. (Tr. 186–88.) Petitioner denied any involvement in the murders (Tr. 187–88) and denied telling his friends that he had participated in the Kogan murders. (Tr. 192–95.) Petitioner testified that he confessed only after being told that he had failed the polygraph test, that David was implicating him, and that the detective administering the polygraph test, Detective Ponzi, said that he would get "one to three" if he confessed and put all the blame on David. (Tr. 200, 203–04.) The jury found Petitioner and David guilty of four counts of murder (two counts of murder in the second degree and two counts of felony murder) and each received 50-years-to-life sentences. (Tr. 327; Resp. Aff. Ex. C (Sentencing Transcript 7, 10).)

Petitioner appealed the conviction alleging that (1) he was denied due process when the trial court failed to instruct the jury not to consider his co-defendant's confession as evidence of Petitioner's guilt; (2) the prosecutor's summation was prejudicial; (3) the trial court's

4

instructions regarding the burglary charge were erroneous; and (4) the consecutive sentences were excessive and harsh. The Appellate Division rejected Petitioner's claims regarding the jury instructions and the summation as unpreserved, found that his sentence did not warrant a reduction and affirmed his conviction. *People v. Diaz,* 544 N.Y.S.2d 500 (App. Div. 1989). On October 26, 1989, the Court of Appeals denied leave to appeal. *People v. Diaz,* 74 N.Y.2d 895 (1989).

On February 28, 2006, Petitioner filed a post-conviction motion pursuant to N.Y. Criminal Procedure Law § 440 ("440 motion") seeking an order directing DNA testing on evidence from the crime scene and to vacate his sentence or to modify his sentence based on (1) ineffective assistance of counsel; (2) prosecutorial misconduct; and (3) newly discovered evidence. (Pet. 4; Resp. Aff. Ex. J (state court 440 motion).) In its opposition papers, the People noted that many of Petitioner's claims were based on the trial record, and thus, they were procedurally barred. (Resp. Aff. Ex. K (People's Memorandum of Law Opposing 440 motion 1–5).) In his reply papers, Petitioner claimed he was actually innocent in order to defeat the procedural bar rule. (Pet. Ex. C (Aff. in Support of 440 motion 15–16).) On August 27, 2007, the trial court denied Petitioner's 440 motion for DNA testing and to vacate or modify Petitioner's conviction. (Resp. Aff. Ex. L (Judge Reichbach's Decision and Order).) The trial court found that (1) the crime scene evidence was no longer available for testing, (2) the "vast majority of [Petitioner's] claims [were] based on the record" and therefore barred from review, (3) Petitioner failed to show ineffective assistance of counsel, and (4) the sentence imposed was "not illegal or otherwise invalid." (*Id.*) On December 24, 2007, the Appellate Division denied leave to appeal (Pet. 6–7, Ex. C (Appellate Division Decision).) On February 21, 2008, May 19,

2008, and September 9, 2008, the Appellate Division denied Petitioner's repeated motions for reargument. (Pet. Ex. C (Appellate Division Decisions).) On September 23, 2008, Petitioner filed the instant petition.[3]

## II. Discussion

### a. Standard of Review

Under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), an application for a writ of habeas corpus by a person in custody pursuant to a state court judgment may only be brought on the grounds that his or her custody is "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A petitioner is required to show that the state court decision, having been adjudicated on the merits, is either "contrary to, or involved an unreasonable application of, clearly established Federal law" or "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Lafler v. Cooper*, 566 U.S. —, —, 132 S. Ct. 1376, 1390 (2012).

For the purposes of federal habeas review, "clearly established law" is defined as "the holdings, as opposed to dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A state court decision is "contrary to," or an "unreasonable application of," clearly established law if the decision (1) is contrary to Supreme Court precedent on a question of law; (2) arrives at a conclusion different

---

[3] In 1994, Petitioner's co-defendant David Diaz filed a timely petition for a writ of habeas corpus challenging his conviction. *Diaz v. Senkowski*, No. 94 CV 0392 (CPS) (E.D.N.Y. filed Jan. 27, 1994). By order dated September 14, 1994, the Court denied David's habeas petition. The United States Court of Appeals for the Second Circuit affirmed the Court's decision finding that, *inter alia*, the state record supported that the confession was voluntary. *Diaz v. Senkowski*, 76 F.3d 61, 65 (2d Cir. 1996).

6

than that reached by the Supreme Court on "materially indistinguishable" facts; or (3) identifies the correct governing legal rule, but unreasonably applies it to the facts of the petitioner's case. *Id.* at 412–13; *see also Harrington v. Richter*, 562 U.S. —, —, 131 S. Ct. 770, 785 (2011) (outlining the relevant factors). In order to establish that a state court decision is an unreasonable application, the state court decision must be "more than incorrect or erroneous." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *see also Portalatin v. Graham*, 624 F.3d 69, 79 (2d Cir. 2010) ("If none of these conditions is met, even if the federal court would have reached a different conclusion on direct review, the petition must be denied."). The decision must be "objectively unreasonable." *Andrade*, 538 U.S. at 75. In addition, factual determinations made by the state court are presumed to be correct, and the petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

### b. Statute of Limitations

Before proceeding to the merits of the instant petition, the Court must consider whether the petition was timely-filed. With the passage of the AEDPA on April 24, 1996, Congress set a one-year statute of limitations for the filing of a petition for a writ of habeas corpus by a person in custody pursuant to a state court conviction. 28 U.S.C. § 2244(d)(1). The one-year period runs from the date on which one of the following four events occurs, whichever is latest:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such state action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1)(A)-(D).[4] Under subsection (A), the instant petition is untimely. A conviction is final upon expiration of the 90-day period for seeking a writ of certiorari; thus, Petitioner's conviction became final on January 24, 1990, 90 days after October 26, 1989, the date the Court of Appeals denied leave to appeal. *Saunders v. Senkowski*, 587 F.3d 543, 548–49 (2d Cir. 2009) ("The AEDPA one-year statute of limitations begins to run . . . on the date on which [petitioner']s state conviction became final."); *Williams v. Artuz*, 237 F.3d 147, 150–51 (2d Cir. 2001) ("'[D]irect review,' as used in Section 2244(d)(1)(A), includes direct review by the United States Supreme Court via writ of certiorari, and . . . the limitations period for state

---

[4] Petitioner does not argue – and a review of the record does not support – that subsections (B)-(D) apply. To the extent Petitioner argues that he has newly discovered evidence so that subsection (D) would apply, the Court finds no merit to that claim. Petitioner's "new evidence" is not new, in that it was not newly discovered and was discoverable at his trial. *See Rivas v. Fischer*, 687 F.3d 514, 535 (2d Cir. 2012) (The district court's function is to "determine when the facts underlying the claim were known, or could with due diligence have been discovered."). Nowhere does Petitioner argue that the prosecution failed to turn over these police reports to his attorney in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); instead, Petitioner argues that his attorney did not use them in his defense. (*See* Pet'r Reply 10.) Petitioner's argument that his defense attorney did not utilize information from the police reports does not render these reports "new evidence." *See Rivas*, 687 F.3d at 535–38 (Information that was discovered during trial was not newly discovered for the purposes of § 2244(d)(1)(D)); *see also Taylor v. Lantz*, No. 07-CV-1915, 2008 WL 4793726, at *2–3 (D.Conn. Oct. 28, 2008) (Evidence in existence at the time of the petitioner's plea was not "new evidence"); *Escobar v. Miller*, No. 04-CV-169, 2006 WL 2239080, at *4 (E.D.N.Y. Aug. 4, 2006) ("[T]he evidence . . . was available to both petitioner and his former counsel in advance of trial, and thus, could not be considered 'new' by this court.").

8

prisoners therefore begins to run only after the denial of certiorari or the expiration of time for seeking certiorari.").

Because Petitioner's conviction became final prior to the effective date of the AEDPA, he was entitled to a one-year grace period in which to file his habeas corpus petition, *i.e.,* until April 24, 1997. *See Wood v. Milyard*, 566 U.S. —,—,132 S.Ct. 1826, 1831 (2012) ("For a prisoner whose judgment became final before AEDPA was enacted, the one-year limitations period runs from the AEDPA's effective date: April 24, 1996."); *Ross v. Artuz*, 150 F.3d 97, 103 (2d Cir. 1998) ("We conclude that, in light of the importance of the subject matter of habeas petitions and § 2255 motions, the grace period should be clear; and in light of Congress's selection of one year as the limitations period, we conclude that prisoners should have been accorded a period of one year after the effective date of AEDPA in which to file a first § 2254 petition or a first § 2255 motion."). Instead, this petition dated September 23, 2008,[5] was filed more than 11 years after the grace period had already expired. Therefore, unless Petitioner can show that the one-year grace period should be tolled, the petition is barred by 28 U.S.C. § 2244(d) as untimely.

c. **Tolling**

In calculating the one-year limitations period, "the time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted." 28 U.S.C. § 2244(d)(2). The post-conviction proceeding, however, does not start the one-year grace period to run anew. Section

---

[5] The Court applies the prison mailbox rule instead of the date the petition was received by the Court. *See Houston v. Lack*, 487 U.S. 266, 276 (1988) (Prisoner's *pro se* papers were filed at the "time petitioner delivered it to the prison authorities for forwarding to the court clerk[.]"); *Noble v. Kelly*, 246 F.3d 93, 97 (2d Cir. 2001) (applying prison mailbox rule to federal habeas corpus petitions).

9

2244(d)(2) merely excludes the time a post-conviction motion is under submission from the calculation of the one-year period of limitation. *Smith v. McGinnis*, 208 F.3d 13, 16 (2d Cir. 2000) (*per curiam*). Because Petitioner filed his 440 motion on February 28, 2006, well after the one year grace period had expired on April 24, 1997, he cannot avail himself of statutory tolling. *See Doe v. Menefee*, 391 F.3d 147, 154 (2d Cir. 2004) (A state collateral proceeding commenced after the statute of limitations has run does not reset the limitations period); *see also Parker v. Hufford H.I./F.C.I. Schuylkill,* No. 11-CV-3609, 2011 WL 3299073, at *1 (E.D.N.Y. July 29, 2011) ("Although a valid collateral attack on a conviction will toll time where a habeas petition has already been filed, commencing such a proceeding does not restart the clock."); *Moore v. Cook*, 09-CV-2381, 2010 WL 2680328, at *2 (E.D.N.Y. June 30, 2010) ("Petitioner's second § 440 motion, pending from July 11, 2001 through May 8, 2008, similarly had no effect on the timeliness of petitioner's motion. Although a valid collateral appeal will toll time where a habeas petition has already been filed, commencing a collateral review proceeding does not "reset" the clock."). Therefore, Petitioner's 440 motion filed on February 28, 2006, almost nine years after the grace period expired, does not render this petition timely-filed on September 23, 2008.

The limitations period may also be equitably tolled, but only if petitioner "shows (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Holland v. Florida,* 560 U.S. —,—, 130 S.Ct. 2549, 2562 (2010) (internal quotation omitted); *Rivas v. Fischer*, 687 F.3d 514, 538 (2d Cir. 2012) (quoting *Holland* for the equitable tolling standard); *Dillon v. Conway*, 642 F.3d 358, 362 (2d Cir. 2011) (same). Here, Petitioner does not seek equitable tolling; rather Petitioner relies on the actual innocence exception to the statute of limitations. *See Rivas*, 687 F.3d at 539 (distinguishing

10

between equitable tolling and actual innocence exception to AEDPA's statute of limitations). Therefore, the Court will address Petitioner's actual innocence claim.

### d. Actual Innocence

Petitioner raises "actual innocence" as a reason for the Court to consider the merits of his habeas petition, despite the fact that it is outside of the statute of limitations. *See Rivas*, 687 F.3d at 539 ("[A] habeas petitioner 'may use his claim of actual innocence as a 'gateway,' or a means of excusing his' . . . untimely filing under AEDPA's limitation period[.]" (citations omitted)). Petitioner asserts that

> I fall under the actual innocence exception to the procedural bar rule pursuant to *Schlup v. Delo*, 513 U.S. 298 (1995) and *House v. Bell*, 126 S.Ct. 2064 (2006). Since, in light of new evidence I came across which was never presented at trial, it is more likely than not that no reasonable juror would have found me guilty beyond a reasonable doubt.
>
> My constitutional claims are based on my contention that, due to the utter ineffectiveness of my trial counsel and the prosecutor's knowing use of false evidence to secure my conviction, I was denied the full panoply of protections afforded to criminal defendants by the Constitution.
>
> Therefore since I meet the gateway standard of *Schlup* and *House*, I am entitled to an evidentiary hearing so that I may argue the merits of my claims and so that the court can conduct a miscarriage of justice inquiry into my case.

(Pet. 14.) Specifically, Petitioner's new evidence consists of police reports and a pre-sentence report. (Pet'r Aff. 19–21; Pet. Exs. A–C.) Petitioner alleges that he only discovered this "information I never knew about and which had never been presented to the jury by my lawyer" sometime in May 2005 upon receipt of his pre-sentence report. (Pet. Ex. C (Aff. in Support of Appl. for a Certificate Granting Leave to Appeal).) Respondent argues that Petitioner is time-

barred and that he has failed to demonstrate that he is entitled to the benefit of the actual innocence exception. (Resp. Aff. in Opp. 1–12.)

"[A] claim of actual innocence must be both 'credible' and 'compelling.'" *Rivas*, 687 F.3d at 541 (citing *House v. Bell*, 547 U.S. 518, 521, 538 (2006)); *see also Schlup v. Delo*, 513 U.S. 298, 324 (1995) (describing what makes a claim credible). A credible claim of actual innocence consists of "new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Schlup*, 513 U.S. at 324; *see also House*, 547 U.S. at 537 (citing the *Schlup* credibility standard); *Rivas*, 687 F.3d at 541 (same). "For the claim to be 'compelling,' the petitioner must demonstrate that 'more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt – or to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt." *Rivas*, 687 F.3d at 541 (quoting *House*, 547 U.S. at 538). The district court must "'consider all the evidence, old and new, incriminating and exculpatory,' and, viewing the record as a whole, . . . 'make a probabilistic determination about what reasonable, properly instructed jurors would do.'" *Rivas*, 687 F.3d at 542 (quoting *House*, 547 U.S. at 538).

In support of his actual innocence claim, Petitioner argues, *inter alia*, that his confession was false and coerced by police, there was no physical evidence connecting him to the murders, that prosecutors committed misconduct by, *inter alia*, using false evidence and information, and his defense attorney was ineffective by, *inter alia*, failing to cross-examine witnesses, failing to present witnesses on his behalf and failing to use information from police reports at trial. (*See generally* Pet'r Aff. 1–34.)

Petitioner fails to set forth a claim of actual innocence that is either credible or compelling. Despite his argument to the contrary, Petitioner has not asserted a credible actual innocence claim because he has not presented new reliable evidence. The "new evidence" Petitioner relies on are police reports and a pre-sentence report which stated that there were rumors that Zina Kogan's husband owed money to the Russian Mafia and had remarried and moved away shortly after the murders occurred. (*See* Pet'r Aff. 2–3.) Petitioner does not rely on or present any "exculpatory scientific evidence,[6] trustworthy eyewitness accounts, or critical physical evidence," that was not presented at trial. *Schlup*, 513 U.S. at 324; *see also Rivas*, 687 F.3d at 546–47 (finding that the petitioner had "a close case" that only passed the *Schlup* standard because the petitioner was able to present reliable scientific expert testimony not presented to the jury and the Second Circuit "would not expect a lesser showing of actual innocence to satisfy the *Schlup* standard"); *Menefee*, 391 F.3d at 161 (There is a "limited . . . type of evidence on which an actual innocence claim may be based" "in order to take advantage of the gateway[,]" which includes "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial." (citing *Schlup*, 513 U.S. at 324) (internal quotation marks omitted)).

Assuming, *arguendo*, that the police reports could be considered new evidence, Petitioner's claim of actual innocence is not compelling as he fails to show that it is "more likely than not that no reasonable juror would have convicted him." *Schlup*, 513 U.S. at 327. The

---

[6] As to Petitioner's request for DNA testing, the state court denied this request finding that Petitioner failed to make a timely request and that the evidence was no longer available because it had either been lost or destroyed. (Resp. Aff. Ex. L (Judge Reichbach's Decision and Order).) Moreover, the prosecution did not introduce any physical evidence at trial which would require DNA testing or would result in "exculpatory scientific evidence."

Court has reviewed the police report excerpts submitted by Petitioner, along with the trial record and the transcribed video confessions of Petitioner and his co-defendant, and does not find the police report to present any reliable evidence of Petitioner's innocence. The one allegation in the police report that Petitioner relies on is references to "rumors" that the victims' husband/father may have owed money to the Russian Mafia. (Pet. Ex. B.) The police report also states that police followed up on all leads on the case. (*Id.*) The police reports cannot be said to be wholly inconsistent with the confessions as to discredit the confessions.

Petitioner's claim that perhaps Alex Kogan was the intended victim because police received information about his purported debts to the Russian Mafia, or in the alternative, that Alex Kogan paid others to kill his wife and child so that he could remarry is merely conjecture and not proof of Petitioner's innocence. (Pet'r Aff.) Pure conjecture alone is not sufficient to meet the actual innocence standard. *See, e.g., Rivas*, 687 F.3d at 546 (Police failure to pursue other leads in the investigation did "not compellingly point to Rivas's innocence[.]"); *Bower v. Walsh*, 703 F. Supp. 2d 204, 228 (E.D.N.Y. 2010) ("The fatal flaw in [the petitioner's] argument is that he offers no direct evidence pointing to any other person's involvement in the crimes for which he was convicted. . . . Speculation that another person committed crimes for which a petitioner was convicted is insufficient to establish innocence, especially in light of evidence to the contrary.").

A review of the record demonstrates that the trial centered on Petitioner's videotaped confession and that of his co-defendant both admitting to involvement in the Kogan murders. Both confessions were played for the jury and both defendants testified at trial. Although Petitioner testified that this statement was false and a product of coercion by police (Tr. 182–

14

188) – and his attorney questioned the police as to their tactics in obtaining the statement (Tr. 100–04, 223–25) – the jury found Petitioner and his co-defendant guilty of the murders.

While Petitioner makes a compelling argument that his attorney failed to utilize information from the police reports and catalogues a litany of purported errors – inconsistencies and failures on the part of his attorney and the prosecution – the district court is not permitted to make an independent judgment of whether reasonable doubt exists, "but instead requires a probabilistic determination about what reasonable, properly instructed jurors would do." *House*, 547 U.S. at 538. The jury had the opportunity to consider the various inconsistencies between the statements provided by Petitioner, his co-defendant, and the police officers, and they also had the opportunity to weigh Petitioner's credibility and the credibility of the police officers; nevertheless, they rendered a guilty verdict. *See, e.g., Madison v. Hulihan*, No. 09-CV-337, 2012 WL 1004780, at *6–7 (E.D.N.Y. Mar. 23, 2012) (finding that jury was aware of inconsistent testimony but still found petitioner guilty); *Brockington v. Marshal*, No. 07-CV-0286, 2011 WL 4424429, at *5 (W.D.N.Y. Sept. 21, 2011) (on remand, district court found that petitioner's new evidence – consisting of the medical examiner's case narrative – failed to demonstrate that it was more likely than not that a reasonable juror would have found him guilty beyond a reasonable doubt); *Rosario v. Ercole*, 582 F. Supp. 2d 541, 559 (S.D.N.Y. 2008) (Where the trial is "a credibility contest" between the parties' dueling evidence, the Court could not "conclude that no reasonable juror would have been persuaded by the prosecution's case[.]"). Given that the jury was cognizant of the discrepancies in the confessions of Petitioner and his co-defendant and their trial testimony, and they could weigh their demeanor and credibility as they

15

both testified at trial, Petitioner has not shown that a reasonable juror would not have convicted him of the murders based on his purported new evidence.

Petitioner's reliance on *Schlup v. Delo*, 513 U.S. 298 (1995) and *House v. Bell*, 547 U.S. 518 (2006) to support his actual innocence claim based on new evidence is misplaced. Petitioner argues that he "fall[s] under the actual innocence exception to the procedural bar rule pursuant to *Schlup* . . . and *House* . . . . Since, in light of new evidence I came across which was never presented at trial, it is more likely than not that no reasonable juror would have found me guilty beyond a reasonable doubt." (Pet. 14.) In *Schlup*, a black inmate was stabbed to death by a white inmate and Schlup was found guilty of the inmate's murder. *Schlup*, 513 U.S. at 302–13. The Supreme Court found that eyewitness statements that Schlup was not involved in the crime and statements from corrections staff that cast doubt on Schlup's guilt were sufficient to allow his habeas petition to be considered on the merits. *Id.* at 331. In *House*, a woman was murdered and left in an embankment and House, an acquaintance of the victim, was found guilty of the murder. *House*, 547 U.S. at 521. There were problems in the evidence presented and trial and new evidence that implicated the victim's husband: specifically that blood found on Petitioner's pants and presented at trial as belonging to someone other than Petitioner (possibly to the victim) had been contaminated in the police lab and the semen found on the victim's clothing matched the victim's husband and not Petitioner. *Id.* at 540–53. Thus, the Supreme Court found that scientific evidence and other evidence directly implicating the victim's husband was sufficient to allow House's habeas petition to proceed on the merits. *Id.* As discussed above, contrary to Petitioner's repeated assertions, he does not present any new reliable evidence which would support his claim that his case falls into the actual innocence exception and allow this Court to

16

consider the merits of his claims challenging his judgment of conviction. Accordingly, the petition must be dismissed as time-barred as Petitioner has failed to show a credible and compelling claim of actual innocence.

### III. Conclusion

For the foregoing reasons, the petition for habeas corpus is denied as time-barred pursuant to 28 U.S.C. § 2244(d)(1) and the Court will not issue a certificate of appealability. *See* 28 U.S.C. § 2253(c)(2). Petitioner's request for appointment of counsel is denied. The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Memorandum and Order would not be taken in good faith and therefore *in forma pauperis* status is denied for the purpose of an appeal. *Coppedge v. United States*, 369 U.S. 438, 444–45 (1962). The Clerk of Court is directed to close the case.

SO ORDERED.

Dated: September 24, 2012
      Brooklyn, New York

S/Judge Brodie

MARGO K. BRODIE
United States District Judge